State had a refrain of overwhelming evidence of guilt. The only thing overwhelming in this case was evidence of misconduct. Let me point to three instances the State simply can't get past the threatening haywire texts. Having done a forensic evaluation of Mr. Rodriguez's phone, the detective testified in a hearing, never told it to the jury, that, quote, the haywire texts and app were not recovered from the data on Mr. Rodriguez's phone. And that's 6ER1339. If there's any question, we also have AG testifying that she had blocked Mr. Rodriguez's phone, hence the haywire. However, he was able to get through in what was testified to on at least two calls that were confirmed with his cell number, which means he wasn't the one blocked. And further, she referred to the person who was texting her with a derogatory term for an African American and mentioned that they had been together for four months longer than she had even met. I thought one of those texts, she did say Daniel, blah, blah, blah. She did say Daniel in one. She did, he did not. And she did refer to him as Daniel. Whether there is another Daniel, whether there is a slip, as people who might have multiple lovers may make, he was, at the time, he was still pleading with her. The person on the text was pleading with her to get back. After that slip, we had the encounter with the police, which they never brought in. And then afterwards, having heard her call him Daniel, he is now enraged and threatening. So while we don't know, I don't think that that would be dispositive. Can I just focus you a little bit more? I don't know about my colleagues, but I think you make some good arguments with respect to prosecutorial misconduct for purposes of procedural default. But you also have to show prejudice. And I think that's your, probably your biggest hurdle here. Well, let me turn to the prejudice issue. The prejudice here, we're in ineffective assistance of appellate counsel. The prejudice is that he did not get, he did not raise the misconduct on appeal, and that it would have, on appeal, resulted in reversal under Arizona case law. Well, you can say that, but we have the only decision that's arguably reasoned from the Arizona courts is from the Arizona PCR court, and that's with regard to trial counsel. But if, in fact, the trial court says it wouldn't have succeeded and there wouldn't have been any prejudice, then that means there's not an argument for the appellate counsel to have made that had the chance of success that you something to the contrary. Well, we have to go back, of course, through Wilson v. Sellers to the PCR holding, and they don't actually even discuss IAAC. But how could you have IAAC if you haven't had IAAC by the trial counsel? Because there'd be nothing to complain Well, you can argue that the ineffectiveness is the failure of trial counsel to object to the prosecutorial misconduct. I mean, it seems to me these issues are kind of buried together, and though it is true the trial court doesn't rule on a broad argument of prosecutorial misconduct, although it did rule on some particular episodes, the problem all gets wrapped up into what the lawyer should have done. And the trial court says the lawyer did what he had to do, and it wouldn't have made any difference anyway. Your Honor, with due respect, there is ineffective assistance of trial counsel for failure to object, and then there is misconduct by the government. And that one is a separate one. In the reply at 15 to 16, I cite a dozen cases that would have reversed this case on the basis of cumulative misconduct. We had not an isolated incident or a mild form of misconduct that would have resulted in reversal. So what evidence is there of willful misconduct? Certainly the Arizona appellate courts treat willful misconduct more severely. But how is it that we're so sure that it's willful? We know it's willful because he continued it. He started it and continued it. Well, you're just saying doing it more than once demonstrates that it's willful, and I don't know if that's true. I mean, I've argued cases, and I have my recollection of the evidence, and I offer that recollection. The fact that I offer it more than once doesn't demonstrate that I know my recollection is wrong. We have, even in the burden-shifting issue, the objection and returning to it, objection and returning to it. Third time, he's overruled. But that has been said to be a willful, in the case law I cited, that was a willful, repeated misconduct. So I think, you know, even when you look at the threatening haywire texts, the commenting on silence, the fabricated confession, misstating the law, which interferes with the right to counsel and confrontation. Those things under Arizona law, under the Escalante case, when we get to prejudice, under Arizona law, it's not, is there overwhelming evidence of guilt? The law, Escalante says, could a jury have found differently? And the could, they say it's not would, it's could. And the jury certainly could have found differently in this case. Well, if they believed the victim, I forget what her name was, her initials, the jury, that is, if the jury had believed her, why couldn't they have returned a verdict of guilty? Well, they could have believed her. I mean, she told a pretty coherent story about what happened. I would not characterize it as a coherent story. Well, I mean, she told the story of her relationship with the petitioner. She did. She was contradicted by eyewitnesses in both instances. We have her not reporting it. We have her lying and misrepresenting things. Finally, she had to start invoking and get counsel. I thought there was evidence after the second shooting that they found bullet casings in his car. Yes. Correct? Yes. And they found on his phone text messages that he wanted to sell his gun? Yes. Doesn't that sort of line up with her testimony? Well, the text messages that he wanted to sell a gun have nothing to do with her testimony. No, but I mean, isn't it somewhat in line with her overall story? Not the text messages about selling the gun. Why not? Because what that's about is why the police never found the gun. And it wasn't a reasonable inference to start with. It was an unreasonable one that in the minutes that he had after the text message before he was arrested that he found someone, sold the gun, got the money, hid the money because they didn't find it. And then the shell casing, remember the shell casing in question, although it's hard to follow back and forth which one it is, it's way back in the trunk, way under things in the trunk. It wasn't expelled from the shooting. Her say-so has been problematic throughout. Once she invoked, her testimony should have been stricken. And she had the motive to get rid of him. Again, she identifies the person on those. The cell text did not come from Mr. Rodriguez. She identified that person as a different person, and we know that he was not the one blocked. That all points to that he was not, that she was not reliably telling it. And then we have the eyewitnesses who saw a black, looked like a Mustang car, not Mr. Rodriguez's. We have them giving different accounts of what happened on January. And we have, in the February instance, we have the eyewitness from across the street who identifies the car, not just, yeah, it looks like he identified it as a car he'd seen there for a year before she had ever even met Mr. Rodriguez. Her statements were not going to be reliable. Can a jury, could a jury find otherwise? Yes. I'm beyond my time. We'll certainly give you time for rebuttal, but can I ask you one clarifying question? You're colloquially with Judge Clifton about the basis for the ineffective assistance of trial counsel claim. Was one of the bases that the trial counsel had failed to object to the prosecutorial misconduct? Trial counsel objected extensively to a number of things, and that is listed at footnote 10, I believe, in the reply brief, maybe in the other brief. Let me just be more precise. Was one of the grounds for the ineffective assistance of trial counsel claim predicated on trial counsel's failure to object to the prosecutor's misconduct during closing argument? Yes, that was certainly one of those. Okay. And there was an objection that there were several objections during closing argument to some of it, and afterward, the attorney, the defense attorney asked for a mistrial because of the highly inappropriate things that were said. Okay. All right. We'll give you some time for rebuttal. Thank you. Let's hear from the State. Okay. May it please the Court, Counsel. Good morning. My name is David Ull. I'm an assistant attorney general with the Arizona Attorney General's Office on behalf of respondents. I would like to begin with the discussion, I believe it was with Judge Piaz, regarding overwhelming evidence of guilt. I didn't say overwhelming. I'm sorry. Evidence of guilt. I will argue it is overwhelming evidence of guilt, but specifically as to whether the jury could believe the victim. And really, in this case, the jury, if we take the victim out of it, the evidence will still overwhelmingly prove that this defendant was guilty because the, I'll say uncontested in a sense, the indisputable evidence. I think you have to believe that the victim correctly identified the petitioner as the shooter. If you don't believe that, then there's no case because there's no other witness who identifies him. Correct. To that point, she would have had to have identified him. But if you take the, I guess the objective evidence here, was that the shooter in this case was text messaging with the victim prior to and leading up to the shooting, sending threats, discussing the potential shooting that was going to happen, and sending those threats. And that conversation was romantic in nature. So that person who was texting her had a romantic relationship with the victim. Now those are the haywire texts. Those are the haywire texts, yes, Your Honor. Which were not on his phone. Which were not on his phone, correct. But as Judge Watford pointed out, the victim did say, refer to him as Daniel, not once but twice. The second time occurred at 1793. Excuse me. I believe it was 1793. I can get the ER on that specifically if I have that incorrect. But there was twice that the victim referred to him as Daniel. He had no response to that. He said, no, I'm not Daniel. What are you talking about? It didn't enrage him further. He was already enraged. So there was no reason for this jury to believe that it was not Daniel Rodriguez, the defendant in this matter. So that was the text messages, the haywire messages. Beyond that, there was discussion about a folder during those text messages. And we know that the victim gave Detective Hitticus a folder with information related to Daniel Rodriguez. I think it was specifically the information about the car that he had, that he was driving on this occasion. So that information also came out during those text messages. And she said, I'm going to provide him a folder. And he said, go ahead, give him the folder. I don't care. Something to that effect. Before you just run through all of this evidence, I guess I'd like to ask you about one specific charge of misconduct that you or your colleagues at the AG's office didn't respond to in the answering brief. Your opponent, I think, argues with some force that the prosecutor during closing the argument deliberately, knowingly, willfully misrepresented to the jury that those haywire text messages were, in fact, found on Petitioner's phone. Obviously, that was a pretty significant point, because if they had been found on his phone, the phone recovered from him, that would be extraordinary cooperation of her account. I'm looking at one passage that your opponent highlighted in particular, and it does seem to me that the prosecutor, I just don't know how to explain it, other than was trying to pull the wool over the jury's eyes in saying that all of those text messages were also found on his phone. So you never responded to that in the answering brief, and I wondered why. It was cited as the most egregious instance of misconduct, and you just ignored it. Well, the reason was because I argued just that the district court correctly found that it was a general reference to text messages in general. And I would agree that it would seem like a serious issue. However, in the context of this trial, defense counsel was arguing that the state could not prove the phone was his, merely because it was found in his car. So the state could not prove it was his phone. So it was a general reference to text messages, because one of the things the prosecution had to do was take the text messages that were matching on the respective devices between one another and the phone calls and say they matched up. That was one way the state proved that that phone belonged to Daniel Rodriguez. So that's the context of this trial and why those statements, I think, are correctly observed as general references to text messages to prove that the phone belonged to Daniel Rodriguez. However, if we look at it differently and take it out of that context, as I already kind of discussed, there was significant evidence for the jury to find that these messages were from Daniel Rodriguez, number one. The victim identified them as coming from him, as we just discussed. Right, but tell me if I'm remembering Arizona law correctly, because you wanted to talk about overwhelming evidence of guilt. But I thought the Arizona cases that your opponent cited took a different view when willful misconduct by the prosecution was found. In that instance, there was much more of a tendency to reverse, basically to keep in check prosecutors who are not playing by the rules. And so that's why this particular allegation of misconduct concerned me. Because even if, as you say, there was other evidence and maybe the jury would have come out the same way, it seemed like there was a trend in the Arizona cases, at least, to say, well, wait a minute, if the prosecutor knowingly and willfully engaged in misconduct, that's just we're in a different league altogether. And I would just dispute the idea that it was willful misconduct. I think it was a general reference to text messages. The prosecutor never said outright explicitly that the text messages, the haywire messages, were found on Daniel Rodriguez's phone. And during direct examination of Detective Hitticus, he brought out, Detective Hitticus responded that all the messages were found on Mr. Rodriguez's phone except for the messages sent through the text messaging application. And that was a correction of the question posed to him by the prosecutor. So that's why I'm saying the prosecutor knew what the results of the forensic examination were, put a question to the detective that the detective, to avoid perjuring himself, had to correct and specifically point out that, no, no, no, not all of the messages, only the, and to clarify, the haywire messages were not found. The example I'm thinking of in closing argument is in a context where the prosecutor is discussing the threatening text that were exchanged on the day of the second shooting. And it's in that context that he says, she told you all about that, all of which is corroborated by her cell phone record and the text messages found on her phone, talking about the exchanges on that second shooting, and also found and corroborated on the defendant's phone. So that's the passage that seems to me is that is absolutely not accurate. And in context, it's not a general reference to all of the text messages. It's a reference to the specific text messages that were exchanged on February 14th, whatever that second date was. That's the passage that your opponent highlighted. You just said nothing about it. And so it led me to think that you have no answer to that, but you're still claiming that that's just a general reference to all the text messages? I think that was what the prosecutor was doing, was a general reference to the text messages, because, again, much of the defense was that the phone, Rodriguez's phone found in his car, did not belong to him, so he had to argue and present evidence of why it did belong to him. And I think that was the question during direct examination to the detective, was to say, well, these phones match up, right? It wasn't suggesting that. . . I don't believe it was a correction by the detective to the prosecutor. He was just asking, the prosecutor was asking, do the text messages and phone calls line up? And he said yes, again, to establish that it belonged to the defendant except for the haywire messages. Well, he said the messages sent through the text messaging application. And, again, if this court disagrees with that and disagrees with the district court's finding here that it was just a general reference, number one, I think the jury instructions that were given to the jury, that the lawyer's comments are not evidence, would have cured any prejudice resulting from that. And also, again, the jury was never presented evidence that the messages did belong on his phone. They were told they weren't found on Mr. Rodriguez's phone. They were only introduced through the victim's phone. So, again, I think the jury had all the information to know that those messages were not found on Rodriguez's phone. They were, in fact, found on the victim's phone. And any misstatements by the prosecutor would have been cured by that jury instruction that lawyers' comments are not evidence. So I have a question for you about various procedural matters that were involved in this case. So as I understand it, the prosecutorial misconduct claim, the straight-up prosecutorial misconduct claim is procedurally defaulted. Is that correct? Yes. But the IAC claim is not procedurally defaulted. Is that correct? Correct. He raised it in the state post-conviction proceeding. That's correct. Okay. Is the prejudice inquiry any different on the IAAC claim than on the cause and prejudice hurdle that he has to get over in order to get directly at the prosecutorial misconduct claim? I'm sorry, what was the last part of that? In order to get directly at the prosecutorial misconduct claim. So there's two. I'm just curious about the nature of the prejudice inquiry on the IAAC claim versus the prejudice inquiry on the procedural default for prosecutorial misconduct. Correct. Well, I guess under the IAAC, it would just be looking at whether or not if the prosecutorial misconduct claim had been raised, if it would have had a reasonable probability of leading to reversal. I think under the prejudice claim on the cause and prejudice for procedural default, you would look additionally, well, in both circumstances, you would look under federal and Arizona law at the overwhelming evidence of whether or not there was overwhelming evidence of guilt that would have rendered any error harmless or irrelevant. So I guess at the end, I don't know that there is a difference between the analysis, other than you have to obviously prove that the IAAC attorney was deficient, and then for prejudice, just proving that it would have been a reasonable probability of reversal. So sorry, I'm just talking out, but I don't know that I see a difference. Okay. Over time, but this is important enough, I'll indulge your patience and my colleagues. We start with, for any ineffective assistance claim with deficient performance, and one of the things that struck me here was the letter sent by appellate counsel to petitioner, petitioner here, where he basically said, I didn't make that other argument that we talked about, but the letter, I was afraid it would weaken the suppression argument, which he goes on and describes in that letter as a long shot. This is what ER 414. So I didn't wind up filing on the issue we talked about, and then he says, here's the brief. There's some typos. I didn't have time to read it, to catch the typos, sorry, and I'm thinking, the whole prosecutorial misconduct argument would have been a harder one to develop. The suppression argument had basically been written about already, and I can't help but have the feeling that that was more of a hill than the lawyer was prepared to climb. I don't understand how making a misconduct argument would have undermined the suppression argument, which is what the letter suggests and what often is argued in these cases. So I start with the question of deficient performance and ask, is there anything really that would support the proposition that the performance was not deficient? I mean, he didn't seem to dig into the argument that would have at least as much traction, if not more, than the suppression argument, which he described as a long shot, and I don't see how making the misconduct argument would undermine the suppression argument. So can you help me with that? Just looking at the case law that appellate attorneys are expected to winnow out the weaker arguments, and based on his research, and I would agree with that. What research? I mean, do we have any information about what he did? We do have, yeah, the letter itself says he did research on the case law on prosecutorial misconduct. Well, but the letter also said he didn't have time to check for typos, so does that give us reason to have confidence his research was very extensive? Well, unfortunately, we don't know the extent of his research. In some IAC cases, there's been evidence developed in the district court, and I haven't seen any of that here, and I take it there isn't any testimony by the lawyer as to what he did. That's correct. We just have his letter saying he did the research, and as a strategic matter, he decided not to raise that claim. Okay. Well over my time, so I just ask that you affirm the district court. Okay, thank you. If we could put two minutes on the clock for rebuttal. Judge Clifton, I think you're exactly right on that. I know the amount of work it took me when I was assigned to try and ferret through that, and it certainly was a much easier thing to go for the legal issue on the Fourth Amendment, which he acknowledged would not work. One of the alternative remedies that we would be happy to have is for the court to remand this to the district court for an evidentiary hearing so we could flesh that out if your honors did not have enough information on that. However, the Strickland holding says that strategic decisions are entitled to deference, but only if they were reasonable litigation decisions, and here we did not have it. It's like in the Rogers case where they left out all those doctors they could have brought in. We left out an argument, and under the ABA standards, which is our standard of care, appellate counsel is to raise what the defendant wants as long as it's not frivolous. Obviously, that was not frivolous. I think in what your honor Judge Watford had said also makes a lot of sense. The willfulness that Judge Clifton was concerned about really falls through, and you can see in the development of the misrepresentations on the text. He did say that the text we saw and the text they saw were only those haywire texts, that those were on Mr. Rodriguez's phone. Under Arizona law, that alone, Minette case, that alone is reversal, and that is also reversal under the Supreme Court's Donnelly v. Christophero, which is very similar, where the defendant had, or where the prosecutor had said, talked about a paint stain being a blood stain when he knew it was paint, and the Supreme Court said consistent and repeated misrepresentation of a dramatic exhibit may profoundly impress the jury, and they reversed. We do have case law, both federal and state, that would reverse this case. Under the circumstances, one other thing we would be open to, if the court is concerned that IAAC is not a good vehicle, we would be open to the court asking for supplemental briefing on a standalone issue of misconduct, and I would be happy to provide a motion for a COA to this court as well. Okay. Thank you very much. The case just argued is submitted.
judges: PAEZ, CLIFTON, WATFORD